## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

IN RE:                                    CASE NO. 10-07072 (ESL)

PALMAS COUNTRY CLUB, INC.                  CHAPTER 11

     Debtor

## AMENDED DISCLOSURE STATEMENT

## TABLE OF CONTENTS

## SECTION I – INTRODUCTION

## SECTION II – ADEQUACY OF DISCLOSURE IN A CHAPTER 11 CASE

## SECTION III – THE DEBTOR

      3.1    Background of Debtor

      3.2    Board of Directors

      3.3    Significant Post-Petition Events

      3.4    Assets as of Petition Date

      3.5    Liabilities as of the Petition Date

## SECTION IV – THE PLAN

      .1    Overview

      .2    Means of Funding

      .3    Injunctions, Releases and Discharge

      .4    Feasibility of the Plan

      .5    Classification of Claims

            1.1    Class 1 – Administrative Claims

            1.2    Class 2 – Priority Tax Claims

            1.3    Class 3 – Secured Creditors

            1.4    Class 4 – TDF Loan Agreement

            1.5    Class 5 – Unexpired Leases

1.6        Class 6 – Unsecured Trade Creditors

1.7        Class 7 – Unliquidated and Contingent Claims

1.8        Class 8 – Parent Company Loans

1.9        Class 9 – Equity Holders

4.6        Treatment of Claims and Voting Rights

**SECTION V – ALTERNATIVES TO THE PLAN**

5.1        Alternative Plan of Reorganization

5.2        Liquidation under Chapter 7

**SECTION VI – TAX CONSEQUENCES OF THE PLAN**

**SECTION VII – FINANCIAL INFORMATION RESPECTING THE DEBTOR**

**SECTION VIII – LIQUIDATION ANALYSIS**

8.1        Best Interest Test

**SECTION IX – LEASES AND EXECUTORY CONTRACTS**

9.1        General

9.2        Treatment

**SECTION X – MISCELLANEOUS**

10.1      Professionals Employed

10.2      Estimated Administrative Expenses

10.3      Objections to Claims

10.4      Retention of Jurisdiction

10.5    Modification of the Plan

10.6    Effective Date of the Plan

10.7    Effect of Confirmation and Discharge

**SECTION XI – CONCLUSION**

**EXHIBIT A** – Urgent Joint Motion and Stipulation on the Use of Cash Collateral and Adequate

Protection Urgent Joint Motion

**EXHIBIT B** – Urgent Joint Motion Authorizing the Sale of Certain of the Debtor's Assets,

Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of All Liens,

Claims, Interests and Encumbrances

**EXHIBIT C** – Schedule of Allowed Claims

**EXHIBIT D** – Liquidation Analysis

**EXHIBIT E** – Debtor's Audited Financial Statements as of December 31, 2009 and 2008

# I.  INTRODUCTION

PALMAS COUNTRY CLUB, INC. (the "<u>Debtor</u>" or "<u>PCCI</u>" or the "<u>Club</u>") provides this Disclosure Statement to its creditors and other parties in interest in order to disclose that information deemed by Debtor to be material, important and necessary for its creditors and other parties in interest to arrive at a reasonably informed decision in exercising their right to vote for acceptance of Debtor's 11 U.S.C. Chapter 11 Plan ("<u>Plan</u>") that is being filed with the United States Bankruptcy Court for the District of Puerto Rico ("<u>Bankruptcy Court</u>") contemporaneously with the filing of this Disclosure Statement (the "<u>Reorganization Case</u>").

Creditors are advised that they have the right to vote to accept or reject the Plan proposed by Debtor. They are further advised that in order for the Plan to be accepted by a class of creditors, the creditors composing such class, that hold at least two thirds in dollar amount and more than one half in total number of the allowed claims of such class that vote must accept the Plan.  Therefore, it is very important for creditors to exercise their right to vote in reference to the acceptance or rejection of the Plan, since in accordance to Section 1141(d) of the Bankruptcy Code, except as otherwise provided therein, in the Plan or in the order confirming the Plan, the confirmation of a plan discharges a debtor from any debt that arose before the date of confirmation and from any debt of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not the creditors have accepted the Plan or have filed their claims, or such claims are deemed filed or allowed under Section 502 of the Bankruptcy Code.

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO THE VALUE OF PROPERTY) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE FINANCIAL INFORMATION CONTAINED HEREIN IS AS OF AUGUST 4, 2010 (THE "PETITION DATE") AND HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND, CONSEQUENTLY, IS UNABLE TO WARRANT OR REPRESENT THAT IT IS WITHOUT ANY INACCURACY, ALTHOUGH EFFORTS HAVE BEEN MADE TO BE ACCURATE.

## II. ADEQUACY OF DISCLOSURE IN A CHAPTER 11 CASE

Post-petition disclosure and solicitation is governed by the provisions of Section 1125 of the Bankruptcy Code.

Section 1125, requires that, other than in small business cases under Section 1125(f) of the Bankruptcy Code, which is not the situation in Debtor's case, a written "disclosure statement" approved by the Court after notice and hearing be transmitted to holders of claims and interests together with the plan or a summary thereof.   Post-petition solicitation of acceptances or

rejections of a plan may be made only at the time of or after transmission of the "disclosure statement". 7 *Collier on Bankruptcy*, ¶1125.01[1] (Matthew Bender, 15 Ed. Rev.).

Also, Section 1125(a)(1) requires that the disclosure statement contain "adequate information" in sufficient detail as far as reasonably practicable in light of the nature and history of the particular debtor and the condition of the debtor's financial records. It must be such information as would enable a hypothetical reasonable investor (typical of the holders of claims and interests of the relevant class) to make an informed judgment about the plan. Adequate information, however, need not include information about any other possible or proposed plan. *Collier on Bankruptcy*, op. cit. ¶1125.01[2].

Section 1125(a)(2) defines the hypothetical investor referred to in subsection (a)(1) as an investor having:

a claim or interest of the relevant class,

such a relationship with the debtor as the holders of other claims or interests of such class generally have, and

such ability to obtain such information from sources other than the disclosure required by section 1125 as holders of claims or interests in such class generally. (*Collier on Bankruptcy*, op. cit. ¶1125.01[2][a]).

Disclosure is the pivotal concept in reorganization practice under the Bankruptcy Code.

As described in the House Report:

If adequate disclosure is provided to all creditors and stock holders whose rights are to be affected, then they should be able to make an informed judgment of [sic. on] their own rather than having a court or the Securities and Exchange Commission inform

them in advance whether the proposed plan is a good plan. Therefore, the key to the consolidated chapter is the disclosure section. (H.R. Rep. No. 95-595, 95th Cong.,1st Sess. 226-231 (1977)).

The definition of "adequate information" in Section 1125(a)(1) requires that a disclosure statement include information in sufficient reasonable detail as far as is practicable. *Collier*, op. cit. ¶1125.02[1].

As stated in the legislative history to Section 1125(a):

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection. There will be a balancing of interests in each case. In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest. (H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 409 (1977)).

The Senate Report expands upon the House Report's description of Section 1125(a) in the following manner:

> Reporting and audit standards devised for solvent and continuing businesses do not necessarily fit a debtor in reorganization. Subsection (a)(1) expressly incorporates consideration of the nature and history of the debtor and the condition of its books and records into the determination of what is reasonably practicable to supply. These factors are particularly pertinent to historical data and to discontinued operations of no future relevance.
>
> A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to

the future course of the business sufficient to meet the feasibility standard in section 1129(a)(11) of this title. It may thus be necessary to provide estimates or judgments for that purpose. Yet it remains practicable to describe, in such detail as may be relevant and needed, the basis for the plan and the data on which supporters of the plan rely.

S. R. Rep. No. 989, 95th Cong. 2d §§ 120-121 (1978).

The definition of "adequate information" contained in Section 1125(a)(1) must be considered together with the phrase, "investor typical of holders of claims or interest of the relevant class" defined in Section 1125(a)(2). That definition recognizes that the quality of information available to members of a given class will vary as will the sophistication of members of various classes. (*Collier*, op. cit. ¶1125.02[3]).

For example, a trade creditor may have a general unsecured claim for $1,000 and be a member of a class, which includes a commercial bank holding a claim of $1,000,000. The bank presumably will be more sophisticated in financial matters than the trade creditor and, depending on the circumstances of the case, may have access to detailed current and historical financial information concerning the debtor's business which is not, and has not been, available to the trade. Trade creditors, on the other hand, may have information with respect to the debtor's business and the sophistication necessary to interpret such information which is not enjoyed by the debtor's debenture holders or shareholders. (*Collier*, op. cit. ¶1125.02[3]).

Section 1125(d) specifically provides that the adequacy of disclosure is not to be governed by any otherwise applicable nonbankruptcy law, rule or regulation. (*Collier*, op. cit. ¶1125.02[4]).

As stated in the House Report:

The bill also permits the disclosure statement to be approved without the necessity for compliance with the very strict rules of Section 5 of the Securities Act of 1933, section 14 of the Securities Exchange Act of 1934, or relevant State securities laws. Without such a provision, the court would have no discretion in approving disclosure statements that go to public classes, but would be required in every case to require a full proxy statement or prospectus whenever public classes were solicitated [sic]. Such a statement requires certified audited financial statements and extensive information. The cost of developing a prospectus or proxy statement for a large company often runs well over $1 million. That cost would be nearly prohibitive in a bankruptcy reorganization. In addition, the information normally required under section 14 may simply be unavailable, because of the condition of the debtor. Finally, court supervision of the contents of the disclosure statement will protect the public investor from any serious inadequacies in the disclosure statement.

The provision does not prohibit a section 14-type statement or a prospectus. In some cases it may indeed be appropriate to go that length in disclosure. The courts will have to determine the need on a case-by-case basis. The section merely does not require it in every public case. (H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 227-229 (1977)).

The aforesaid is even more applicable to Debtor considering that this Disclosure Statement does not go to public classes.

### III. THE DEBTOR

**3.1 Background of Debtor**

Debtor was organized in 1996 and is the owner and operator of certain country club amenities located in the master planned resort community of Palmas del Mar in Humacao, Puerto Rico, consisting of two 18-hole golf courses, a golf clubhouse, a beach clubhouse, a tennis club

and a fitness center, and other related club facilities (collectively, the "Club Facilities").

PCCI's historical cash flows consist of member initiation fees, member dues, golf green and tournament fees, golf cart rental fees, tennis court usage and tournament fees, food and beverage sales, and pro-shop merchandise revenues. PCCI is dependent on cash flows from these sources to provide funds necessary to sustain its operations. PCCI's membership plan agreements ("Membership Agreements") provide for member initiation fees to join the Club, annual dues payable monthly or in advance, and charges for food, beverage and merchandise. The member agreements provide for member initiation fees to be refunded, without interest, 30 years after the date the membership was issued (and after receiving 30 years of dues and related ancillary revenues from the member). If a member resigned prior to the end of the 30-year membership period and the membership of such member was not acquired by the purchaser of his or her residential unit or lot, the membership would be remitted to the Club for resale in the order provided for in the membership plan. PCCI would refund the portion of the membership initiation fee it received when the membership was sold to the new member, with any deficiency to be paid at the end of the 30-year membership period.

From 2002 through 2006, golf membership was relatively constant at approximately 620 members, while Beach/Tennis club members increased from 330 to 470. During 2007, PCCI had an average of 600 active golf members and 500 active Beach/Tennis Club and Social members; 1,100 total active members. Since 2007, active membership has dropped dramatically. As of the Petition Date, PCCI had 440 active golf members and 420 active Beach/Tennis and

Social members, for a total of 860 active members.

From 2000 through 2002, PCCI averaged 47,900 golf rounds played annually on the two courses combined. Beginning in early 2003 through 2004, rounds played fell to 34,900 per year. In 2003, the Candelero Hotel (located in Palmas del Mar) closed, and did not reopen until 2005, as a Sheraton Four Points. The new hotel has produced minimal golf play since re-opening. During this period, a number of new golf courses were built in Puerto Rico, including courses such as Trump International at Coco Beach, Costa Caribe, Las Bambuas, Caguas Reales, El Legado, and Bahia Beach. These new facilities contributed to an already highly competitive market. Furthermore, municipal governments such as San Juan and Guaynabo also developed golf practice ranges and courses.

With the recession in Puerto Rico, golf play, membership sales and dues, food and beverage sales and other revenue sources at the Club dropped drastically. Corporations are reducing budgets and, as a result, tournament rounds and corporate membership sales have declined significantly. Dramatic cuts in corporate financial sponsorships of golf tournaments have also reduced the revenue generated from such events. Golf rounds played in 2008 and 2009, were 33,300 and 30,500, respectively, as compared to 37,700 golf rounds in each of 2005 and 2006 and 39,300 rounds in 2007. Membership sales were also negatively affected by the recession.

PCCI took steps to pare operating costs as much as possible. Operating expenses had been averaging $7.5 million per year from 2005 to 2008. Expenses were reduced by 20% in

2009 to $6.0 million – this is after the impact of inflation on the island, both general and specific

(minimum wage, power cost, and fuel and chemical price increases).    In spite of aggressive

efforts to increase revenues and reduce costs, the Debtor has been operating with significant

yearly deficits.        As of the Petition Date, PCCI had indebtedness to secured creditors in the

approximate amount of $31 million**,** consisting of the following:

| | |
|---|---|
| <u>AFICA Loan Agreement</u> – A loan agreement between the Debtor and the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, an instrumentality of the government of the Commonwealth of Puerto Rico ("<u>AFICA</u>"), dated October 26, 2000 (the "<u>AFICA Loan Agreement</u>"), for the financing of the costs related to the development, construction, equipping, administration and operation of the Club Facilities. Pursuant to the terms of the AFICA Loan Agreement, AFICA agreed to issue bonds in the principal amount of $30,000,000 (the "<u>AFICA Bonds</u>") and to lend that amount to PCCI for the purpose described above.   In furtherance of the AFICA Loan Agreement, and pursuant to the terms of a Trust Agreement entered into by AFICA and PaineWebber Trust Company of Puerto Rico (now UBS Trust Company of Puerto Rico), as Trustee (the "<u>Bond Trustee</u>"), dated October 26, 2000 (the "<u>Trust Agreement</u>"), AFICA issued the AFICA Bonds. | $27,160,000 |
| <u>TDF Letter of Credit</u> – To facilitate and make possible the issuance and sale of the AFICA Bonds, on October 26, 2000, Tourism Development Fund ("<u>TDF</u>") and PCCI executed a Letter of Credit and Reimbursement Agreement pursuant to which TDF issued a Letter of Credit (the "<u>TDF Letter of Credit</u>") to the AFICA Bond Trustee in effect guaranteeing the AFICA Bonds and PCCI's payment obligations related thereto under the AFICA Loan Agreement (the "<u>TDF Reimbursement Agreement</u>").  Pursuant to the TDF Letter of Credit, TDF is require to make payments to the AFICA Bond Trustee sufficient to pay interest and principal on the AFICA Bonds when due if PCCI does not make such payments.  The amount shown represents interest and principal payments on the AFICA Bonds made by TDF on behalf of PCCI in an effort to keep the AFICA Bonds current. | 2,519,255 |
| <u>TDF Reimbursement Agreement</u> – Pursuant to the Reimbursement Agreement, PCCI is required to reimburse TDF for any payments made by TDF under the TDF Letter of Credit, and to pay certain fees and expenses to TDF.  The amount shown represents the amount due and payment to TDF with respect to fees, expenses and other amounts. | <u>760,408</u> |

| | |
|---|---|
| <u>TDF Loan Agreement</u>– On October 19, 2009, TDF extended to PCCI a non-revolving line of credit in the amount of $525,000 for the partial financing of certain of the operating expenses for the Club Facilities incurred by PCCI (the "<u>TDF Loan Agreement</u>"). The amount owed as of the Petition Date was $553,149, including interest. | <u>553,149</u> |
| PCCI secured indebtedness as of the Petition Date | $30,992,814 |

PCCI's payment and other obligations under the AFICA Loan Agreement, the Trust Agreement, the TDF Loan Agreement and the TDF Reimbursement Agreement (collectively, the "<u>Financing Agreements</u>") are guaranteed by substantially all of the Debtor's assets, including, but not limited to, the Club Facilities, all real property, all tangible and intangible personal property, including fixtures, and all accounts receivables and cash (collectively, "<u>Collateral</u>"). The AFICA Loan Agreement relates to a 2000 financing, the proceeds of which were used to pay for the development of PCCI's second golf course, the Rees Jones-designed Flamboyan golf course; the upgrade of the then-existing Palm golf course designed by Gary Player; new golf cart barns; new golf grounds maintenance facilities and equipment; a full-service golf clubhouse including restaurants, kitchen, lounges, locker rooms and administrative offices; and new Beach Club facilities including two pools, a jacuzzi, water features, bars and restaurants. The AFICA Loan Agreement is guaranteed by TDF. When this financing was completed in 2000, PCCI anticipated higher membership sales levels with related member dues, golf play, food and beverage revenues and merchandise sales to enable it to sustain its operations and make debt service payments. Instead, the Club experienced a decline. Payments by TDF under the TDF Letter of Credit and the TDF Loan Agreement provided interim financing to PCCI in 2009 while

it was attempting to secure additional funding to enable it to continue its operations.

   The following provides a summary of select operating data since 2002:

|                    | 2002   | 2003   | 2004   | 2005   | 2006   | 2007   | 2008   | 2009   |
|--------------------|--------|--------|--------|--------|--------|--------|--------|--------|
| Golf Members       | 638    | 621    | 607    | 618    | 630    | 599    | 540    | 487    |
| Beach Club Members | 329    | 328    | 348    | 414    | 474    | 498    | 486    | 452    |
| Total Members      | 967    | 949    | 955    | 1,032  | 1,104  | 1,097  | 1,026  | 939    |
| Golf Rounds        | 48,182 | 35,193 | 34,600 | 37,743 | 37,649 | 39,311 | 33,334 | 30,497 |

   The Debtor is a subsidiary of Palmas del Mar Properties, Inc., ("PDMPI"), the developer

of the Palmas del Mar community.   PDMPI's revenues are derived from sales of real estate

within Palmas del Mar.   PDMPI has invested more than $53 million in the Debtor since the

Debtor's inception.   This capital has been used by PCCI to fund its annual cash deficits.   Since

2007, PDMPI has not sold any real estate parcels, which has eliminated PDMPI's ability to

provide further funding to the Debtor.   Prior to the Petition Date, PCCI had been working with

TDF and the Government Development Bank ("GDB") to obtain additional financing to enable it

to continue to operate. In spite of the best efforts of all parties who were involved in those

negotiations, a mutually acceptable solution was not reached and the Debtor ceased operations

on June 28, 2010 and the Club Facilities were closed.

   The value of the Club Facilities is estimated to be substantially below the amount of the

secured indebtedness of approximately $31 million. The Club Facilities were appraised for TDF

as of June 30, 2009 at $22 million, at a time when the Club Facilities were operating and

generating revenue. Since June 28, 2010, the Club Facilities have been closed and are not

operating, thus, their value has declined.   This June 2009 appraisal also was premised on two

luxury hotels being built at Palmas del Mar that would generate substantial revenues through additional golf rounds and other use of the Club Facilities by hotel guests. The proposed hotel developments that were the basis for the increased revenues in the appraisal are on hold due to the current economic conditions in Puerto Rico.

In July 2010, it became evident the Debtor would not be able to obtain additional funding to enable it to re-commence operations. In connection with its negotiations with PCCI, TDF indicated it might be willing to provide financing to reopen the club under new ownership. Accordingly, in an effort to accelerate the transfer of the amenities to a new owner or operator so that additional funding may be obtained and the facilities could be reopened and enjoyed by members and guests as soon as possible, on August 4, 2010, PCCI filed for reorganization under Chapter 11. Under the Plan, PCCI will not continue as a going concern. Rather, the Club Facilities will be transferred and sold to TDF as payment of substantially all amounts outstanding under the Debtor's secured loan agreements and the club operations will continue under new ownership.

Although required by law to be listed as a creditor in PCCI's petition, PDMPI is neither seeking recovery of any of the $13.5 million of intercompany loans it is owed by PCCI nor any of the $39.7 million of other capital it has invested in PCCI over the years. Instead, PDMPI has agreed to contribute $198,000 of funding for the Debtor's Plan.

PCCI remains committed to working with its secured creditors and the Palmas del Mar community to reopen the Club Facilities under new ownership as soon as possible.

### 3.2 Board of Directors

The Debtor's board of directors and officers are listed below. Since PCCI's inception, these individuals have not received any compensation from PCCI:

| Name | Position |
|------|----------|
| **Directors** | |
| Jaime Morgan-Stubbe | Director |
| Charles E. Hurwitz | Director |
| Shawn M. Hurwitz | Director |
| J. Kent Friedman | Director |
| **Officers** | |
| Shawn M. Hurwitz | Chairman of the Board and CEO |
| Jaime Morgan-Stubbe | President |
| Dan J. Lipnick | Executive Vice President |
| David V. Suson | VP and General Counsel |
| Bernard L. Birkel | Secretary |
| Josue Carrion | Assistant Treasurer |
| Antoinette Fontenot | Assistant Secretary |
| M. Emily Madison | Assistant Secretary |
| Valencia A. McNeil | Assistant Secretary |

### 3.3 Significant Post-Petition Events

Since the filing of the Bankruptcy Petition, Debtor has been directing its efforts towards (i) obtaining authorization to use the remaining funds from its bank accounts for the maintenance of the Club Facilities, and (ii) accelerating the transfer of the Club Facilities to a new owner so that the Club can be reopened as soon as possible.

In this regard, the Debtor and TDF have filed an (i) Urgent Joint Motion and Stipulation on the Use of Cash Collateral and Adequate Protection (attached as **Exhibit A**) whereby TDF has

consented to the limited use of certain of TDF's cash collateral ("Cash Collateral") to satisfy certain maintenance expenses, and an (ii) Urgent Joint Motion Authorizing the Sale of Certain of the Debtor's Assets, Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of All Liens, Claims, Interests and Encumbrances (the "Sale") (attached as **Exhibit B**), aimed at expeditiously re-opening the Club Facilities and generating the most value and benefit to the Debtor's estate and the Palmas del Mar community.   Through the Cash Collateral and the Sale, the Debtor and TDF seek to preserve and maximize the value of the Club Facilities by selling the same to TDF in payment of substantially all amounts outstanding under the parties' Financing Agreements .   Upon closing of the Sale, TDF intends to sell the Club Facilities to Palmas Athletic Club, Inc. ("PAC") (a non-profit entity created by certain Palmas del Mar residents specifically to operate and preserve the Club Facilities).   Pursuant to this transaction, PAC has agreed to purchase from TDF the Club Facilities by assuming, pursuant to new agreements between PAC and TDF, PCCI's pre-petition obligations to TDF under PCCI's loan documents, and, upon closing of that sale, to re-open, operate and maintain the Club Facilities.

A hearing on these motions was held on September 27, 2010.   After hearing the evidence presented thereat, the Court granted Debtor three (3) days to amend its disclosure statement and plan in order to include the TDF Contingent Contribution (defined below), and three (3) days to file objections to the proofs of claims that had been filed as priority claims, and which Debtor deemed to be unsecured claims, in order to establish the feasibility of the proposed plan.   This amended disclosure statement is being filed in compliance with the Court's order.   If the Sale is

finally approved, the Debtor's secured creditors will be deemed to have been paid in full, except for amounts owed pursuant to the TDF Loan Agreement that will be paid only to the extent there is cash available after paying post-petition maintenance expenses. Additionally, the real property taxes owed to secured creditor Municipal Revenue Collection Center, known in Spanish as *Centro de Recaudacion de Ingresos Municipales* ("CRIM"), in the amount of $133,800, will be paid in full by TDF as a condition of the Sale,

### 3.4 Assets as of Petition Date

Assets listed on Debtor's Schedules are an integral part of this Disclosure Statement and to the best of management's understanding are accurate as of the Petition Date. If Debtor learns that its schedules should be amended, it would do so within 20 days after the hearing to discuss the adequacy of the Disclosure Statement.

The Debtor's assets include the Club Facilities, cash, accounts receivable, equipment and inventory and approximately 150 leased golf carts and other ancillary vehicles. All of the Debtor's assets are subject to liens and security interests; the value of the Debtor's assets is believed to be substantially below the amounts owed to its secured creditors.

### 3.5 Liabilities as of the Petition Date

Liabilities as of the Petition Date can be ascertained by reviewing Debtor's Schedules. Moreover, creditors can ascertain the total amount of their claims that would be deemed allowed for purposes of the confirmation of Debtor's Plan in **Exhibit C**. The total allowed claim would be the basis for the distribution to be offered by Debtor (funded by the Debtor's parent) as part of

its Plan.  The Debtor intends to amend its Schedules on or before September 30, 2010 to conform the Schedules to the amounts reported in this Disclosure Statement and reflect any other necessary changes.

The Debtor has calculated the amount of claims deemed allowed for purposes of the confirmation of the Debtor's Plan as follows:

- Administrative Claims – the amount represents the estimated US Trustee fees to be incurred related to the petition.

- Unsecured Priority Tax Claims – the amount represents the amounts owed to CRIM as of the Petition Date for personal property taxes in the amount of $98,000, as indicated in the Debtor's books and records.

- Secured Creditor Claims – the amount represents the amounts owed pursuant to the AFICA Loan Agreement, the TDF Letter of Credit, the TDF Reimbursement Agreement and the TDF Loan Agreement as of the Petition Date, as indicated in the Sale motion; and real property taxes in the amount of $133,800, as indicated in the Objection to the Sale motion filed by CRIM on August 24, 2010.

- Unsecured Creditors – the amount included on **Exhibit C** represents the amount due and payable as of the Petition Date, as indicated in the Debtor's books and records, and will be the basis for the dividend to be distributed pursuant to Debtor's Plan.

- Membership Initiation Fees – Members are not entitled to a refund of their initiation fees (without interest) until the earlier of 30 years after the date the membership was issued (and after receiving 30 years of dues and related ancillary revenues from the member) or within 30 days after the reissuance of the resigned membership to a new member in the order provided for in the Membership Agreements. Accordingly, as of the Petition Date, member initiation fees are not due and payable and therefore are considered unliquidated and contingent as of the Petition Date. The amount included on **Exhibit C** represents the calculated present value of the Debtor's future contingent obligation, which will be the basis for the dividend to be distributed pursuant to Debtor's Plan.

- Other Contingent and Unliquidated Claims – Claims by developers and homeowners' association have been included on **Exhibit C** at a value of $1,000, which will be the basis for the dividend to be distributed pursuant to Debtor's Plan.

Debtor does not have any pending claims entitled to priority by Section 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code, and accordingly, no class was created for said claims under the Plan.

# IV. THE PLAN

## 4.1 Overview

It is Debtor's intention to make payments to its creditors through the Plan primarily consisting of:

1. Payment of all administrative expenses on the later of the Effective Date or as soon as feasible after the date any such claim becomes an allowed Administrative Claim.

2. Payment of 100% of CRIM's allowed priority tax claims consisting of personal property taxes in the amount of $98,000 to be paid from the $198,000 funded by the Debtor's parent company.

3. Secured Creditors, with the exception of amounts owed pursuant to the TDF Loan Agreement, will be deemed to have been paid in full out of the proceeds of the Sale.

4. Payment of the secured TDF Loan Agreement through the surrender of any remaining cash collateral that is not transferred to TDF at the closing of the Sale in one lump sum payment to be made on or before thirty (30) days after the Effective Date. Any resulting deficiency claim (the "TDF Deficiency Claim") will be deemed an unsecured claim in Class 6. TDF has voluntarily elected to forgo any dividend for the TDF Deficiency Claim.

5. Payment of approximately 6% of the claim from the holders of the executory contract for the lease of 150 golf carts and other ancillary vehicles in one lump

sum payment to be made on or before thirty (30) days after the Effective Date if

the Plan is funded with the Parent Company Contribution.  If the Plan is funded

with TDF Contingent Contribution, then this class will receive approximately __

% of their claims.

6.  Payment of approximately 6% of allowed unsecured claims, except for the TDF

Deficiency Claim, in one lump sum payment to be made on or before thirty (30)

days after the Effective Date if the Plan is funded with the Parent Company

Contribution.  If the Plan is funded with TDF Contingent Contribution, then this

class will receive approximately __% of their claims.

7.  Payment of approximately 6% of allowed unliquidated and contingent claims in

one lump sum payment to be made on or before thirty (30) days after the Effective

Date if the Plan is funded with the Parent Company Contribution.  If the Plan is

funded with TDF Contingent Contribution, then this class will receive

approximately __% of their claims.

8.  Non-Debtor affiliate claims shall be discharged and the holders of such claims

shall be entitled to no distribution under the Plan.

9.  All equity interests in Debtor will be cancelled and equity holders will receive no

distribution.

**4.2 Means of Funding the Plan**

The Plan is to be funded by $198,000 from PDMPI, the Debtor's parent company

("Parent Company Contribution") if the releases herein requested are granted.  Of this amount, $98,000 will be used to pay CRIM for personal property taxes and $100,000 for distribution to general unsecured creditors and holders of unliquidated and contingent claims.

If the releases are not granted, then the Plan will be funded by a $150,000 contribution from TDF (the "TDF Contingent Contribution").

### 4.3 Injunctions, Releases and Discharge

The Plan provides for the Collateral to be sold to TDF free and clear of all liens, claims, interests and encumbrances.  Pursuant to the terms of the Sale, TDF and PCCI will completely and unconditionally release and discharge the other and their successors, assigns, shareholders, parents and affiliates, agents and in each instance their directors, officers and employees, (collectively, the "Released Parties") from all claims, liability and/or causes of action, arising on or before the date of this Plan, which they either have or may have against the Released Parties whether relating to the ownership, development, operation, maintenance, the physical condition of the Club Facilities, the Sale or any other matter related to the business and operations of the Debtor or the Club Facilities.

The Plan also provides for entry of releases and permanent injunctions in favor of the Released Parties. These releases and injunctions are an essential part of the Plan and, if entered, will limit the rights of holders of claims against the Released Parties.

If these releases and injunctions referred to above are not entered, the Debtor's parent will not contribute any funds and the Debtor will be required to proceed with the Plan using the

TDF Contingent Contribution.   The releases requested by the Debtor's parent for it and its affiliates are reasonable in the context of this proceeding and supported by the applicable caselaw.  In this case, Debtor will not continue to operate, its business and is liquidating all of its assets through its Plan.  Debtor's parent company and affiliates are not responsible for the debts and liabilities of the Debtor and should be protected from claimants who wrongfully attempt to recover from them any amount allegedly owed by Debtor or any liability that relates to the debtor's activities or operations.   The feasibility of the Plan is based on either the Parent Company Contribution or the TDF Contribution since without them there would be no funds available for the unsecured creditors.   The Parent Company Contribution, together with its voluntary release of the $13,501,703 owed to it by the debtor would provide for a greater recovery for the creditors, is substantial and warrants the releases requested.

### 4.4 Feasibility of the Plan

The Debtor's Plan will transfer ownership of the Club Facilities to a new entity so that they can be re-opened as soon as possible.  Debtor understands that the Plan is a confirmable Plan for the benefit of its creditors, will result in the creation of additional direct and indirect jobs, and enable the Club Facilities to continue to be maintained for the benefit of its members, guests and the Palmas del Mar community.

The proposed Plan provides for payment of $98,000 to CRIM for personal property taxes and $100,000 for distribution to general unsecured creditors and holders of unliquidated and contingent claims.  A Chapter 7 liquidation of the Debtor's assets would produce no distribution

to unsecured creditors and holders of unliquidated and contingent claims.

### 4.5 Classification of Claims

1.1     Class 1 (ADMINISTRATIVE CLAIMS)- Costs and expenses of administration as defined in the Bankruptcy Code as the same are allowed, approved and ordered paid by the Court. Debtor estimates that, at the time of the confirmation of the Plan, Class I administrative claims will be approximately $6,000.

1.2     Class 2 (UNSECURED PRIORITY TAX CLAIMS) – Claims entitled to priority by Section 507 (a) (8) of the Bankruptcy Code, as the same are finally approved and allowed by the Court and consisting of personal property taxes in the amount of $98,000 owed to CRIM.

1.3     Class 3 (SECURED CREDITORS) – Secured claim, excluding the TDF Loan Agreement, consisting of  (i) the AFICA Loan Agreement, in the amount of $27,160,000, (ii) the TDF Letter of Credit in the amount of $2,519,284, (iii) the TDF Reimbursement Agreement in the amount of $760,408 and (iv) real property taxes in the amount of $133,588, each secured by the Collateral, to be paid by TDF as a condition of the closing of the Sale.   Thus, as of the Petition Date, the balance of the amounts owed to secured creditors, excluding amounts owed pursuant to the TDF Loan Agreement (discussed below), was approximately $30,439,692.

1.4     Class 4 (TDF LOAN AGREEMENT) - On October 19, 2009, TDF extended to PCCI a non-revolving line of credit in the amount of $525,000 for the partial financing of certain of the operating expenses for the Club Facilities incurred by PCCI, secured by the Collateral. The amount owed as of the Petition Date was $553,149, including interest.

1.5     Class 5 (UNEXPIRED LEASES) –    The Debtor has one unexpired lease for 150 golf carts, 3 workhorses and 2 food and beverage carts.  The lease expires in 2011.  This lease is being rejected pursuant to  the Plan.  The rejection of this lease will generate a deficiency claim estimated at $135,883.

1.6     Class 6 (UNSECURED CREDITORS) – Unsecured creditors with no executory contract have claims totaling approximately $760,613, to the extent that such claims are approved and allowed by the Court or deemed allowed under the provisions of the Bankruptcy Code.  1.7     Class 7 (UNLIQUIDATED and CONTINGENT CLAIMS) – Club members have unliquidated and contingent claims as of the Petition Date, as no amount were due or payable on that date.  As listed in Exhibit C, Debtor has calculated the present value of each unliquidated and contingent claim taking into consideration the maturity date of each.   In addition, the homeowners' association and developers have filed claims or objections and those claims are unliquidated and contingent, and listed with a value of $1,000 in the aggregate.

1.8     Class 8 (PARENT COMPANY LOANS) – The Debtor owes its parent company $13,501,703 as of the Petition Date.   Under the Plan, the Debtor's parent will receive no distribution.

1.9     Class 9 (EQUITY HOLDERS) – In addition to the $13,501,703 in parent company loans, as of the Petition Date, the Debtor's parent company has contributed additional capital in the amount of $39,681,000 to the Debtor.   Under the Plan, all equity interests in the

Debtor shall be deemed canceled as of the Effective Date and equity holders will receive no distribution.

### 4.6 Treatment of Claims and Voting Under the Plan

| | Description of Claim | Treatment Under Plan | Status/Entitled to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery Percentage |
|---|---|---|---|---|---|
| Class 1 | Administrative Expense Claims | Will be paid in full from Debtor funds | Unimpaired<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $6,000 | 100% |
| Class 2 | CRIM Unsecured Priority Tax Claims consisting of Personal Property Taxes | Personal property taxes to be paid in full from the Parent Company Contribution | Unimpaired<br><br>Not Entitled to Vote | $98,000 | 100% |
| Class 3 | Secured Creditors (AFICA Loan Agreement, TDF Letter of Credit, TDF Reimbursement Agreement and CRIM Real Property Taxes) | Deemed to be paid in full from proceeds from the Sale | Impaired<br><br>Not Entitled to Vote | $27,160,000<br>2,519,255<br>760,408<br><u>133,800</u><br>$30,573,463 | 74% |
| Class 4 | Secured Creditor (TDF Loan Agreement) | Payment from the surrender of any remaining cash that is not transferred to TDF at the closing of the Sale | **Impaired**<br><br>Entitled to Vote to Accept or Reject the Plan | $553,149 | To Be Determined |

| | | | | | |
|---|---|---|---|---|---|
| Class 5 | Acrecent Deficiency Claim | Payment of approximately 6% of allowed unsecured claims from the Parent Company Contribution or 3% if the plan is funded with the TDF Contingent Contribution | **Impaired**<br><br>Entitled to Vote to Accept or Reject the Plan | $135,883 | 6% |
| Class 6 | Unsecured Creditors and TDF Deficiency Claim | Payment of approximately 6% of allowed unsecured claims from the Parent Company Contribution or 3% if the plan is funded with the TDF Contingent Contribution | **Impaired**<br><br>Entitled to Vote to Accept or Reject the Plan | $760,613 | 6% |
| Class 7 | Unliquidated and Contingent Claims | Payment of approximately 6% of allowed unsecured claims from the Parent Company Contribution or 3% if the plan is funded with the TDF Contingent Contribution | **Impaired**<br><br>Entitled to Vote to Accept or Reject the Plan | $723,844 | 6% |
| Class 8 | Parent company loans | No distribution under the Plan | Impaired<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $13,501,703 | 0% |

| Class 9 | Equity Holder and Affiliates | No distribution under the Plan<br><br>Entitled to Releases under the Plan<br><br>All equity interests deemed cancelled as of the Effective Date | Impaired<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $39,681,000 | 0% |
|---------|------------------------------|-----|-----|-----|-----|

THE FOREGOING IS A PRESENTATION OF THE CLASSIFICATION OF CLAIMS UNDER THE PLAN. CREDITORS ARE URGED TO READ THE PLAN IN FULL. THEY ARE FURTHER URGED TO CONSULT WITH COUNSEL OR WITH EACH OTHER IN ORDER TO FULLY UNDERSTAND THE PLAN.  THE PLAN IS COMPLEX INASMUCH AS IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY THE DEBTOR, AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.

## V. ALTERNATIVES TO THE PLAN

If the Plan is not confirmed and consummated, alternatives to the Plan include (a) an alternative plan of reorganization, (b) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, and (c) dismissal of the Reorganization Case.

### 5.1 Alternative Plan of Reorganization

The Debtor believes that the Confirmation and implementation of the Plan is preferable to a liquidation alternative because it provides for the re-opening and continued maintenance and operation of the Club Facilities, payment of taxes owed to CRIM and a payment to PCCI's unsecured creditors and holders of unliquidated and contingent claims.

### 5.2 Liquidation under Chapter 7

If the Plan cannot be confirmed, the Debtor's Reorganization Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee or trustees would be appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. In a liquidation under Chapter 7, the Debtor's priority tax claimant and the Debtor's unsecured creditors and holders of unliquidated and contingent claims would receive no distribution.

The Liquidation Analysis prepared by the Debtor is attached to this Disclosure Statement as **Exhibit D**. The Liquidation Analysis takes into account the nature, status, and underlying estimated value of the assets and the extent to which such assets are subject to liens and security interests. The principal assumption underlying the results of the Liquidation Analysis is that the underlying value of the Debtor's assets is less than the claims of its secured creditors. As of the Petition Date, PCCI has indebtedness to secured creditors in the approximate amount of $31 million. The value of the Club Facilities is estimated to be substantially below $31 Million – the Club Facilities were appraised on June 30, 2009 at $22 million at a time when the Club Facilities were operating and generating revenue. Since June 28, 2010, the Club Facilities have been closed and are not operating, thus, their value has likely declined. Accordingly, since all of the Debtor's assets are subject to liens and security interests, all proceeds generated from a quick sale of the Debtor's assets would go to satisfy secured creditor claims and there would be no

proceeds left for distribution to CRIM for personal property taxes or to PCCI's unsecured creditors or holders of unliquidated and contingent claims.

## VI. TAX CONSEQUENCES OF THE PLAN

The Plan will result in cancellation of indebtedness ("COD"), however, since the COD is part of a proceeding under Chapter 11 of the Bankruptcy Code, there is no realization of income for U.S. federal or Puerto Rican tax purposes. Debtor understands that any taxes resulting from the Plan, including taxes resulting from the Sale, will be expressly discharged as part of the Confirmation of the Plan.

## VII. FINANCIAL INFORMATION RESPECTING THE DEBTOR

Debtor's audited financial statements as of December 31, 2009 and 2008 are attached as **Exhibit E.** Debtor will file monthly statements of cash receipts and disbursements (its "Operating Statements") in a timely manner.

## VIII. LIQUIDATION ANALYSIS

Before confirmation of Debtor's Plan, the Bankruptcy Court must analyze the Plan and determine that it is in the best interest of each impaired class of creditors. One major factor in this analysis is the determination of Debtor's liquidation value and a comparison as to whether this liquidation value exceeds the proposed recovery to impaired classes under the Plan. The proposed treatment of impaired classes under the Plan exceeds any potential recovery through liquidation.

In order to determine the effect on unsecured creditors if a Chapter 7 Trustee attempts

liquidation, a Liquidation Analysis is included as **Exhibit D** hereto. As shown, since all of the Debtor's assets are subject to liens and security interests, the liquidation scenario would produce no distribution to priority and unsecured claims.

### 8.1 Best Interest Test

The proposed Plan provides for $198,000 to be distributed to CRIM for payment of personal property taxes in the amount of $98,000 and $100,000 to general unsecured creditors and holders of unliquidated and contingent claims. A Chapter 7 liquidation of the Debtor's assets would produce no distribution to CRIM or to the general unsecured creditors or to holders of unliquidated and contingent claims.

## IX. LEASES AND EXECUTORY CONTRACTS

### 9.1 General

The Debtor has one unexpired lease for the lease of 150 golf carts, 3 workhorses and 2 food and beverage carts. The lease expires in February 2011. This lease will be rejected.

### 9.2 Treatment

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers a debtor in possession to assume or reject executory contracts and unexpired leases. Generally, an "executory contract" is a contract under which material performance is due from both parties. If an executory contract of unexpired lease is rejected by a debtor in possession, the other parties to the agreement may file a claim for damages incurred by reason of the rejection, which claim is treated as a prepetition claim. If such contract or lease is assumed by a debtor-in-possession, the

debtor-in-possession has the obligation to cure any prepetition defaults thereunder.

Except as otherwise provided therein, any unexpired lease or executory contract that has not been rejected or assumed by Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date will be deemed to have been rejected by Debtor as of the Effective Date, unless prior to the Confirmation Date there is pending before the Bankruptcy Court a motion to assume such lease or contract.

Each Person that is a party to an executory contract or unexpired lease that is rejected as of the Confirmation Date shall be entitled to file, no later than thirty   (30) days after the Confirmation Date (unless an earlier date has been established by the Bankruptcy Court for such claimant, in which case such earlier date shall control), a proof of claim for damages alleged to have arisen from the rejection of such executory contract or unexpired lease, or be forever barred from asserting such Claim against Debtor or the Reorganized Debtor.  Each Person that is a party to an executory contract or unexpired lease subject to a motion to reject that is pending before the Bankruptcy Court on the Confirmation Date shall be entitled to file, not later than thirty (30) days after the date that the Bankruptcy Court approves such motion, a proof of claim for damages alleged to have arisen from the rejection of such executory contract or unexpired lease, or be forever barred from asserting such Claim against Debtor or the Reorganized Debtor.

Debtor estimates that the rejection of this unexpired lease will create a deficiency claim in the amount of approximately $135,883 under the Plan.

# X. MISCELLANEOUS

## 10.1 Professionals Employed

<u>Counsel for Debtor.</u>  With leave of the Bankruptcy Court, Debtor has retained Alexis Fuentes-Hernandez of Fuentes Law Offices as its counsel in connection with its Chapter 11 and other proceedings.

## 10.2 Estimated Administrative Expenses

The Debtor has estimated administrative expenses (US Trustee fees) not to exceed $6,000.  Debtor's counsel was paid a retainer of $100,000 prior to the Petition Date to cover professional services and copying and mailing expenses related to the Reorganization Case, which is expected to cover all legal fees and costs up to confirmation.  However, if the retainer is not exhausted, any available funds will be added to the $198,000 provided by Debtor's parent company to be distributed to general unsecured creditors and holders of unliquidated and contingent claims.

## 10.3 Objections to Claims

Creditors must file proofs of claims no later than 120 days from the Plan Petition Date. As proofs of claims are filed, Debtor will reconcile them to its records and will file objections to claims deemed objectionable not later than twenty (20) days before the Confirmation Hearing.

## 10.4 Retention of Jurisdiction

Notwithstanding confirmation of the Plan, the Bankruptcy Court will retain jurisdiction for all purposes provided by the Bankruptcy Code, including, but not limited to:

1.      The determination of the allowance of claims upon the objection to such claims by Debtor or by any other party in interest;

2.      The determination of requests for payment of claims entitled to priority under 11 USC §507(a)(1), including compensation of parties entitled thereto;

3.      The resolution of any disputes regarding the interpretation of the Plan;

4.      The implementation of the provisions of the Plan and entry and enforcement of orders in aid of consummation of the Plan, including injunctions and releases provided for as part of Debtor's Plan if the Plan is funded with the Parent Company Contribution;

5.      The modification of the Plan pursuant to 11 USC §1127; and

6.      The adjudication of any cause of action, including avoiding powers actions, brought by Debtor, by a representative of the estate, or by a Trustee under the Bankruptcy Code.

**10.5 Modification of the Plan**

Pursuant to the provisions of Section 1127 of the Bankruptcy Code, Debtor has the right to modify or alter the provisions of the Plan at any time prior or subsequent to Confirmation, but before substantial consummation of the Plan.

**10.6 Effective Date of the Plan**

The Effective Date of the Plan will be 10 days after the Confirmation Order is final and unappealable.

### 10.7 Effect of Confirmation and Discharge

Confirmation and the Order of Confirmation will constitute final settlement of payment to all creditors and implementation of all injunctions, releases and discharges as provided for in the Plan if the plan is funded with the Parent Company Contribution.  Pursuant to 11 USC §1141 (d)(3), Debtor will not receive a discharge of debt in this bankruptcy case.

### XI. CONCLUSION

Your receipt of this Disclosure Statement means that, either you requested a copy upon filing and the Court granted the request or the Court has approved this Disclosure Statement as containing adequate information to enable you to make an informed choice.   The Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for against the Plan, nor a guarantee of the accuracy or completeness of the information contained herein.

**DEBTOR'S MANAGEMENT BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.  YOUR VOTE IS IMPORTANT.  PLEASE VOTE PROMPTLY.**

San Juan, Puerto Rico, this 30th day of September 2010.

**PALMAS COUNTRY CLUB, INC.**

S/   JAIME MORGAN STUBBE
President

## <u>EXHIBIT A</u>

Urgent Joint Motion and Stipulation on the Use of Cash Collateral and Adequate
Protection Urgent Joint Motion