IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                          :
                                                :
PALMAS DEL MAR COUNTRY CLUB, INC.               :        Case No. 10-07072 (ESL)
                                                :        Chapter 11
          Debtor.                               :
                                                :
_____:

OPINION AND ORDER

This case is before the court on the objection filed by Palmas del Mar Country Club, Inc. (the "Debtor") to the priority status of Proofs of Claim filed by Mr. Jose Sanchez, Mr. Luis Marin, Mr. Miguel Nazario Franco, Mr. Blair C. Fensterstock and Ms. Janitzia Schurch (collectively the "Claimants"), (the "Objection")(Docket No. 89). The Claimants allege that the membership deposits they paid the Debtor have priority status pursuant to 11 U.S.C. § 507(a)(7). The Debtor alleges that they are general unsecured claims. In addition, the Debtor claims that the Claimants have failed to overcome the strong presumption against treating general unsecured claims as priority claims and that the members got what they paid for the moment it was paid, that is, membership in the club, therefore they do not qualify as the types of parties, nor have the types of claims that Congress intended to protect with Section 507(a)(7). The Claimants filed oppositions to the objection (Docket Nos. 104, 116, 120 and 121). For the reasons stated herein the Objection is hereby granted.

The Debtor, prior to the bankruptcy petition, operated golf, tennis and beach club facilities and amenities (the "Facilities") at Palmas del Mar, Humacao, PR. In order to join the clubs, a member entered into a membership agreement with the Debtor. The membership agreement was set forth in a March 1991, a September 2000, and a March 2002 membership plan (collectively the "Membership Agreements"). Pursuant to the Membership Agreements a

member was required to make an up-front payment called a membership deposit (the "Membership Deposit") and to pay monthly or yearly dues. According to the Membership Agreements the Membership Deposits were refundable to members under certain circumstances, to wit, (i) after the member formally resigned, the membership was placed on a waiting list for reissuance and when similar memberships were subsequently sold, the resigned membership was reissued in accordance with the formula provided for in the Membership Agreement; or (ii) upon the lapse of 30 years from the issuance of the membership[1]. As of the date of the petition there were 417 members on the resignation list, with some being on the list since as far back as January 2003. Payment of the Membership Deposit only entitled the Claimants to become a member of the clubs but did not entitle members access to club benefits which were only afforded to members upon payment of their monthly or yearly dues. Members are required to pay separately for all services and goods at the Facilities.

The Membership Agreements provide that the Debtor can, in its sole discretion, terminate and discontinue operation of the Facilities, terminate or modify the Membership Agreements and/or sell the Facilities. The Membership Agreements further provide that the Membership Deposits received will initially be deposited in an interest bearing escrow account at a local financial institution until completion of the new golf facilities, and that two-thirds of the

---

[1] The Membership Agreements read as follows:

Each person who desires to acquire a Signature Membership in the Club must pay a membership deposit to the Club, as determined by the Club from time to time. The Club will be obligated to refund the membership deposit upon the earlier of the following:

(a) within sixty (60) days after the resignation and reissuance of the Signature Member's membership in the Club; or
(b) thirty (30) years from the date the member acquired their Signature Membership in the Club.

membership proceeds be held in the escrow account, plus the accrued interest, shall be released to the club upon the completion of the eighteen holes of the new golf course; and the remaining one-third, plus interest, shall be released to the club upon the issuance of a use permit for the new golf clubhouse.

The legislative history of 11 U.S.C. § 507(a)(7) shows that the purpose in creating this priority was to protect consumers who leave a deposit or lay merchandise away and do not receive the merchandise from the retailer when the retailer files bankruptcy. The Debtor concludes that these Claimants are not the type of consumers this provision intends to protect.

In turn, the Claimants argue that their claims arise from a refundable membership deposit and the legislative intent behind Section 507(a)(7) was to protect consumers that paid money for lay away plans, deposits on merchandise or gym memberships, among others. The Claimants sustain that the Membership Deposits are comparable to gym memberships and thus contemplated within the meaning of "deposits" pursuant to Section 507(a)(7). They further contend that the Membership Deposits were given in connection with the acquisition of services that were not provided, and which were for personal, family or household use. The Claimants argue that if a Club Member did not pay his dues, the Membership would be terminated and refunded in accordance with the same terms and conditions as a Member who resigned his Membership. The Membership Deposits were in fact guaranteed refundable by the Membership Plan. Furthermore, upon payment of the Membership Deposit a Member was not required to pay golf green fees or court fees for the tennis facilities, and these are indeed services. Finally, the Claimants argue that the refundable deposits had to be segregated from the Debtor's other cash holdings.

Discussion

The Bankruptcy Code provides in section 507(a)(7) as follows:

(a) The following expenses and claims have priority in the following order:

...

(7) Seventh, allowed unsecured claims of individuals, to the extent of $2,600 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family or household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(7). The purpose of this priority is to protect consumers who make deposits for goods or services that at the time of the bankruptcy filing were not provided to such consumer. 4 Alan N. Resnick and Henry J. Sommer, Collier on Bankruptcy, ¶507.09 (16th Ed. Rev'd 07/2010). The operative word in this provision is "deposit" which has been defined as "something placed for safekeeping: as (a) money deposited in a bank, (b) money given as a pledge or down payment. Merriem-Webster Online Dictionary. In re Heritage Village Church and Missionary Fellowship, Inc., 137 B.R. 888 (Bankr. D.S.C. 1991). Also "to place for safekeeping or in trust", "to give as security or in part-payment", "anything laid away or entrusted to another for safekeeping", "anything given as security or in part payment." The Random House College Dictionary (Rev'd Ed. 1980), and "the act of giving money or property to another who promises to preserve it or to use it and return it in kind." Black's Law Dictionary (8th Ed. 2004).

The legislative history indicates that this priority should be broadly interpreted. Therefore, there is some confusion in cases considering this priority, and some courts have granted the priority to consumer claims although they seem to be out of the scope of the statutory language. 4 Collier on Bankruptcy at ¶507.09.

- 4 -

The legislative history of this priority provides as follows:

> The purpose of this priority is to protect consumers who leave a deposit or lay merchandise away, and who do not receive the merchandise from the retailer who files a petition.
>
> A consumer that pays money on a layaway plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or a gym membership, is a general unsecured creditor of the business to which he had given his money.  Very few consumers are aware of their status as general unsecured creditors.  If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag.  Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors.  Because of his ignorance and his inability to bargain with a retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do.

In order to remedy this situation this bill provides a priority for these consumer creditors of a business in bankruptcy.  Id. at ¶ 507.09[1].

There are situations that are clearly within the scope of the statute, such as, consumer purchases on layaway, and the seller files bankruptcy before the consumer finishes paying for the good; or a consumer makes a 50% deposit on a piece of furniture, the balance of which is due at the time of the delivery, but the seller files bankruptcy before delivery.  Id. at ¶ 507.09[2].  In fact, some courts have held that the language of the statute is unambiguous and thus the legislative history is irrelevant to its interpretation.  In re Heritage Village Church and Missionary Fellowship, Inc., 137 B.R. at 895.  The Heritage court determined that the priority afforded by this Section is specifically conditioned upon the making, by a consumer, of a "deposit" prior to the commencement of the bankruptcy proceeding and that the plain meaning of the word "deposit" is that it is a partial payment establishing the depositor's right to receive good or services upon the completion of the payments.  In determining that the claim in question was not entitled to priority status pursuant to 11 U.S.C. § 507(a)(7) the Heritage court reasoned as follows:

These payments, solicited as gifts or investments and made by the Plaintiffs to the Debtor, do not fall under the definition of "deposit"... [E]ach Lifetime Partner's payment completely satisfied the partner's obligations to the Debtor with respect to the Lifetime Partnership. The relationship did not require further payments by Lifetime Partners and as such, did not constitute a deposit relationship...

No one disputes that whatever rights Lifetime Partners may have possessed, be they memberships paid in full or on time, those rights were fully vested pre-petition. Payments made by Lifetime Partners, were not, in any sense of the word, deposits. The word deposit does not appear in any of the promotional literature attached as exhibits to either the Plaintiffs' or the Defendant's pleadings. Moreover, no trust relationship is alleged to have been created with respect to the Lifetime Partners' monies, nor have the Plaintiffs alleged that the Lifetime Partners' payments were, or should have been, segregated by the Debtor. In essence, the rights and responsibilities of individual Lifetime Partners and the Debtor were both fully operative and were being delivered and provided prior to the filing of the bankruptcy petition. The fact that the benefits of the Lifetime Partner memberships were being delivered and provided pre-petition is further cause to support a determination that the Plaintiffs fall without the literal purview of § 507(a)(6).

Id. at 896.

Conversely, there have been courts that have broadly interpreted the statute. For example it was determined that tenant's security deposits are within the scope of this provision, although the unreturned security deposit itself does not constitute goods or services and the leased premises will normally have been "provided" prior to any obligation to return the deposit. Collier on Bankruptcy, ¶507.09[2][a] citing Guarracino v. Hoffman, 246 B.R. 130 (D. Mass. 2000). However, the Guarracino court based its decision mainly on the fact that an individual tenant is not a business creditor, the deposit is a pre-requisite to housing and thus not negotiated at arm's length between equals, and, most importantly, it is a consumer's money held in trust and the legislative history evidences Congress' intent to protect the same. 264 B.R. at 134. See also, In re River Village Associates, 161 B.R. 127 (Bankr. E.D.Pa., 1993).

In the case of In re WW Warehouse, Inc., 313 B.R. 588 (Bankr. D. Del 2004) the court held that claims based on gift certificates to purchase merchandise from retailer that had not been redeemed when the bankruptcy petition was filed were entitled to 507(a)(7) priority status despite

the fact that they were not based on down payments or partial payments. In order to reach its decision the WW Warehouse court examined the legislative history of the statute and concluded that the same was passed to give priority to consumers who found themselves in the same position as gift certificate purchasers, that is, those who paid money on lay away plans or made deposits on merchandise assuming their deposit was tantamount to a trust fund and because of their ignorance and inability to bargain with a retail merchant, are unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. 313 B.R. at 594. The court explained as follows:

> The W.T. Grant problem which section 507(a)([7]) was designed to correct arose when Grant, a retailer filed bankruptcy. Prepetition it had issued "scrip" to customers for their use in connection with future purchasers. When Grant filed its Chapter XI petition for arrangement, scrip holders were treated as unsecured creditors. This led to a large public outcry. Many of the people who had purchased scrip were under the belief that they had deposited money with W.T. Grant that remained theirs until they redeemed the scrip and were outraged to find that their money had been commingled and dissipated.

> The drafters of the Code believed that it was appropriate to provide some protection to consumers in such situations. Unlike businesses that knowingly extend credit and run the risk of non-payment, consumers that make advance deposits on merchandise do not typically realize that they are extending credit when they make an advance payment for goods or services.

Id.

Similarly, in the case of In re Salazar, 430 F.3d 992 (9th Cir. 2005) the Ninth Circuit held that "deposit" as provided in 507(a)(7) may include the advance of full payment for consumer goods or services because despite the literal definition of the word, the "[m]erchants' violation of consumers' expectations and trust is precisely what Congress responded to when it passed the statute in question." 430 F.3d at 996. Courts have held that other examples of a "deposit" include money paid for the purchase of an extended warranty contract, In re Tart's T.V., Furniture and Appliance Co., Inc., 165 B.R. 171 (Bankr. E.D.N.C. 1994) and tuition payments In

- 7 -

re Longo, 144 B.R. 305 (Bankr. D.Md. 1992).

In the case before us the Claimants made an up-front payment in order to become club members of the Debtor. Although the term Membership Deposit was used in the Membership Agreements, these up-front payments are not "deposits" within the purview of Section 507(a)(7). The Membership Agreements clearly provide the conditions precedent to the reimbursement of the Membership Deposit, which are: (i) after the member formally resigned, the membership was placed on a waiting list for **reissuance** and **when similar memberships were subsequently sold**, **the resigned membership was reissued** in accordance with the formula provided for in the Membership Agreement; or (ii) upon the lapse of 30 years from the issuance of the membership. Furthermore, the Membership Agreements provide that the Membership Deposits would be used to fund the building of the golf course. "Deposit" has been defined as "money given as a pledge or down payment", "anything laid away or entrusted to another for safekeeping", "anything given as security or in part payment", and "the act of giving money or property to another who promises to preserve it or to use it and return it in kind. In this case the Claimants had no expectation that the Membership Deposits would be placed on escrow to be reimbursed to the member upon his or her resignation and thus no trust relationship was created with respect to the Claimants' monies. The legislative history cited in the caselaw clearly indicates that Section 507(a)(7) was passed to protect those consumers who made payments, whether partial or full, thinking that the recipient of the monies would hold them until the services they were purchasing were provided, and that the monies remained their property until the services purchased were provided. The Membership Agreements unambiguously state that the Debtor was not holding their money in trust. The Membership Agreements provided that the Membership Deposits would be used for improvements.

In addition, the Membership Deposits were never treated as security for the future provision or delivery of services or goods. The rights of such Claimants were fully vested upon payment of the Membership Deposit because upon such payment they became club members, which was what the Membership Deposit made them entitled to. The up-front payments provided by the club members were for an immediate service which was provided, and not for a future right to buy, lease, or rent any property. The rights and responsibilities of the Debtor were both fully operative and were being delivered and provided prior to the filing of the bankruptcy petition.

The payment of the "deposit" was a prerequisite for the membership, subject to being refunded pursuant to the conditions set forth in the Membership Agreements. The Debtor is contractually liable to the Claimants pursuant to the terms of the Membership Agreements. However, the liability is not entitled to Section 507(a)(7) priority.

Conclusion

In view of the foregoing the objection filed by Palmas del Mar Country Club, Inc. to the priority status of Proofs of Claim filed by Mr. Jose Sanchez, Mr. Luis Marin, Mr. Miguel Nazario Franco, Mr. Blair C. Fensterstock and Ms. Janitzia Schurch (Docket No. 89) is hereby granted. The claims are allowed as general unsecured claims for the amounts filed.

SO ORDERED.

In San Juan, Puerto Rico, this 29th day of December 2010.

Enrique S. Lamoutte
United States Bankruptcy Court

- 9 -